1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DR. ELLEN LEVINE et al.,                                    No. C 05-04764 MHP

        Plaintiffs,

      v.

MIKE JOHANNS,

        Defendant.
_____/

AMERICAN BISON, et al.,                                     No. C 05-05346 MHP

        Plaintiffs,

      v.

GEORGE W. BUSH, et al.          **MEMORANDUM & ORDER**
                               **Re: Motion to Dismiss**
        Defendants.
_____/

      Plaintiffs Dr. Ellen Levine et al. ("Levine plaintiffs") filed this action against Mike Johanns,

Secretary of the U.S. Department of Agriculture (USDA), seeking declaratory and injunctive relief.

Plaintiffs claim that the current USDA policy regarding slaughter methods of poultry is unlawful.

Plaintiffs American Bison et al. ("Bison plaintiffs") filed this action against George W. Bush et al.

seeking declaratory and injunctive relief for allegedly unlawful USDA policies concerning the

slaughter of exotic animals.  Upon a motion by the plaintiffs, the court related the two cases.  Now

before the court is defendant's motion to dismiss both complaints for lack of subject matter

jurisdiction and for failure to state a claim on which relief can be granted.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

In 1958, Congress passed the Humane Methods of Slaughter Act (HMSA).  Pub. L. 85-765, 7 U.S.C. §§ 1901–1906.  Designed to prevent animal suffering and improve working conditions in slaughterhouses, the HMSA specified that "cattle, calves, horses, mules, sheep, swine, and other livestock" must be slaughtered by humane methods.  Pub. L. 85-765 § 2(a), 7 U.S.C. § 1902(a).  The Act defined "humane methods" of slaughter to require, among other things, that animals be rendered insensible to pain prior to slaughter.  Id.

In 1978, Congress incorporated provisions of the 1958 HMSA into the Federal Meat Inspection Act (FMIA) of 1906.  Pub. L. 95-445, 21 U.S.C. § 610(b).  By the terms of the 1978 HMSA, the USDA will inspect meat only if the animals have been slaughtered in accordance with the humane slaughter requirements of the 1958 HMSA.  Id.  The 1978 HMSA applied humane slaughter standards to only "cattle, sheep, swine, goats, horses, mules, and other equines."  Id.  The 1978 HMSA repealed sections 3, 4(c) and 5 of the 1958 HMSA, but retained the other sections, including section 2(a) (which specifies which methods of slaughter are "humane" and which species are covered by the statute) and section 4(b) (which authorizes the Secretary to designate slaughter methods as inhumane for each species of livestock).  Pub. L. 95-445 § 5(b); Pub. L. 85-765 § 4(b).

The Levine plaintiffs' complaint challenges a USDA Notice ("Notice") issued on September 28, 2005, titled "Treatment of Live Poultry Before Slaughter."  Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56624 (Sept. 28, 2005).  The Notice states that there is no federal statute governing the humane slaughter of poultry, but recommends that the poultry industry adopt voluntary measures to improve slaughter practices.  70 Fed. Reg. 56625.

The Levine plaintiffs allege that the Notice is erroneous because the 1958 HMSA, as applied to "other livestock," is still in force.  Plaintiffs argue that the conclusion in the Notice must therefore rest on an interpretation of "other livestock" which excludes poultry.  This interpretation, the Levine

UNITED STATES DISTRICT COURT
For the Northern District of California

plaintiffs argue, disregards the plain meaning of the 1958 HMSA and is arbitrary and capricious.  As a result of the Notice, poultry processors are allowed to slaughter poultry inhumanely without violating federal law.

According to plaintiffs, the industry practice amongst poultry processors is to slaughter birds in the following manner.  First, a worker takes a conscious bird and shackles it upside-down onto an assembly line; the bird is then dipped in an electric stun bath, cut at the neck, and bled.  Next, the bird is dipped in a vat of scalding water in order to remove the feathers.  Levine Pls.' Complaint ¶¶ 58–74.

This process allegedly increases the risk of bacterial contamination in the following ways.  First, contamination occurs in the stun bath.  When electrocuted, some birds defecate into the bath water.  Id. at ¶ 87.  Subsequent birds passing through the water absorb the contaminants either by contact with the water or by inhaling the water.  Id.  Second, bacterial contamination picked up during the stun-bath may be spread at the next stage, where birds are immersed in a vat of scalding water.  Id. at ¶ 88.  After being electrocuted, each bird is cut on the neck and bled.  Id. at ¶ 71.  If a bird is bled for too short a time period, it will enter the scalding water while still conscious.  Id. at ¶ 73.  Conscious birds can inhale the scald water and absorb bacteria present in the water.  Id.  Consumers who eat contaminated meat that has not been properly cooked can then become ill from food poisoning.  Id. at ¶ 91.

Dr. Ellen Levine, Beverly Ulbrich, Krista Kielman and Gretchen Wallerich are members of the Humane Society of the United States (HSUS).  Kandra Boykin is a member of East Bay Animal Advocates (EBAA).  HSUS and EBAA are non-profit organizations dedicated to preventing the cruel treatment of animals, particularly in the agricultural sector.  HSUS and EBAA brought this action on behalf of their members who are regular consumers of poultry meat.  As a result of the USDA's Notice, the members allegedly face a higher risk of becoming ill each time they eat poultry which has been inhumanely slaughtered.

John Does I and II work in poultry processing plants.  John Doe I catches live birds and hangs them in shackles on the assembly line.  John Doe II was injured while shackling live birds, and has been temporarily reassigned to another area of the plant.  Once his injury has healed, John

3

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   Doe II intends to return to the "live hang" area.  Both workers claim that the USDA's Notice results

2   in the increased risk that they, and other poultry workers, will suffer physical and emotional injuries.

3   Birds that are conscious and sensible to pain scratch and peck workers.  In an effort to escape, birds

4   flap their wings, thereby spreading dirt and dust.  Workers then inhale the dust and develop

5   respiratory problems.  Conscious birds also defecate onto workers.  Additionally, plaintiffs claim

6   that workers observe conscious animals suffering from broken wings and legs, bleeding, and

7   experiencing extreme pain.  Plaintiff workers assert that observing animal suffering causes them

8   emotional distress, which, they claim, results from the USDA Notice.

9       Equal Justice Center (EJC) is a non-profit organization dedicated to advancing the civil

10   rights of low-wage workers.  The mission of the Western North Carolina Workers' Center

11   (WNCWC) is to improve wages and working conditions for low-wage and immigrant workers in

12   Western North Carolina.  The USDA's Notice injures EJC and WNCWC, they claim, by causing

13   them to spend resources assisting poultry workers who have been injured at processing facilities.  By

14   resulting in unsafe working conditions, the USDA Notice undermines the organizations' programs

15   designed to improve working conditions in poultry plants.

16       The Bison plaintiffs, similarly, allege that USDA regulations interpreting the 1958 HMSA

17   have failed to apply humane slaughter requirements to "other livestock"—specifically, bison,

18   reindeer, elk, antelope, rabbit, and ostrich.  The Bison plaintiffs argue that the USDA's failure to

19   apply humane slaughter regulations to any species of livestock other than those expressly listed in

20   the 1958 HMSA violates both the plain meaning of the HMSA and the APA.  As a direct result of

21   the USDA's lack of regulations, meat processors are allowed to slaughter certain species

22   inhumanely without violating federal law.

23       Plaintiffs American Bison (*Bison bison*) and Reindeer (*Rangifer Tarandus*) are raised and

24   slaughtered for meat.  Their attorneys allege, on their behalf, that they are inhumanely slaughtered in

25   violation of the 1958 HMSA.

26       The Humane Farming Association (HFA) is a non-profit organization dedicated to protecting

27   farm animals and human health.  HFA brings this action on behalf of its members, who allegedly

28

4

1   suffer emotional distress "simply because they know of the rampant mistreatment of Unprotected

2   Animals at the time of slaughter." Bison Pls.' Complaint ¶ 31.

3       In addition, HFA's members regularly consume meat, including bison and reindeer meat.

4   Gideon Levenbach and Pauline Kelly are HFA members who regularly consume meat, including

5   bison and reindeer.  HFA, Levenbach and Kelly allege that as a result of the USDA's failure to

6   enforce humane slaughter standards for bison and reindeer, individuals face an increased risk of food

7   poisoning from eating meat which has been slaughtered inhumanely.

8       On November 11, 2005, the Levine plaintiffs filed this lawsuit alleging that the USDA's

9   September 28, 2005 Notice violated the 1958 HMSA and the APA.  On December 23, 2005, the

10  Bison plaintiffs filed this lawsuit alleging that the USDA's failure to apply the 1958 HMSA to other

11  species of livestock violates the 1958 HMSA and the APA.  On January 12, 2006, the Levine

12  plaintiffs moved to relate the two cases.  On January 27, 2006, the court granted plaintiffs' motion to

13  relate the cases.  Defendant now moves to dismiss both complaints in their entirety.  Defendant

14  moves for dismissal on the grounds that plaintiffs cannot establish the elements of Article III

15  standing, including injury-in-fact, redressability and traceability.  Defendant also claims that

16  plaintiffs cannot establish prudential standing.  Finally, defendant argues that because plaintiffs do

17  not challenge a final agency action, the court lacks jurisdiction under the APA.

18

19  LEGAL STANDARD

20  I.    Subject Matter Jurisdiction

21      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) asserts that the court

22  lacks "jurisdiction over the subject matter."  Fed. R. Civ. P. 12 (b)(1).  The party claiming federal

23  jurisdiction has the burden to prove that jurisdiction exists.  Sissoko v. Rocha, 440 F.3d 1145, 1161

24  (9th Cir. 2006).  Federal district courts are "courts of limited jurisdiction" and Article III of the

25  Constitution restricts the jurisdiction of federal courts to "cases"  and "controversies."  Exxon Mobil

26  Corp. v. Allapattah Servs., 125 S. Ct. 2611, 2616–17 (2005); Lujan v. Defenders of Wildlife, 504

27  U.S. 555, 559–60 (1992).  Under Article III, federal courts cannot entertain a litigant's claims unless

28  that party demonstrates concrete injury, satisfying the burden to demonstrate both constitutional and

*Column (left margin):* UNITED STATES DISTRICT COURT  For the Northern District of California

5

UNITED STATES DISTRICT COURT
For the Northern District of California

prudential standing to sue. Lujan, 504 U.S. at 560.  To meet constitutional requirements, a plaintiff must show that (1) he has suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent"; (2) the injury is fairly traceable to the challenged actions of the defendant; and, (3) "it [is] 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision."  Id. at 560–61 (internal quotations and citations omitted).  Prudential requirements for standing include (1) whether plaintiff's alleged injury falls within the "zone of interests" protected by the statute or constitutional provision at issue, (2) whether the complaint amounts to generalized grievances that are more appropriately resolved by the legislative and executive branches, and (3) whether the plaintiff is asserting his or her own legal rights and interests, rather than those of third parties.  See Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1179 (9th Cir. 2000); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979); Powers v. Ohio, 499 U.S. 400, 410 (1991).

II.      Failure to State a Claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  Because Rule 12(b)(6) focuses on the "sufficiency" of a claim—and not the claim's substantive merits—"a court may [typically] look only at the face of the complaint to decide a motion to dismiss."  Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).  Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.), cert. denied, 484 U.S. 944 (1987).  In addition, pursuant to Federal Rule of Evidence 201, "a court may take judicial notice of 'matters of public record'" without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment.  Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001) (quoting Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986)).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46 (1957). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not, however, accept as true allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. See Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Clegg v. Cult Awareness Network, 18 F.3d 752, 754–55 (9th Cir. 1994).

DISCUSSION

Before considering whether plaintiffs have stated a claim under the Administrative Procedures Act, the court must determine whether it has jurisdiction over these actions pursuant to Article III of the Constitution.

I.      Article III Standing

Defendant moves to dismiss plaintiffs' claims on the grounds that plaintiffs do not allege an injury-in-fact and thus lack Article III standing. Each plaintiff's alleged injuries will be addressed in turn.

        a.      Increased Risks to Consumer Health

Individual and association plaintiffs contend that the USDA's interpretation of, or failure to interpret, the 1958 HMSA causes an increased risk of contracting food-borne illnesses from inhumanely slaughtered animals. Defendant argues that such harm is not an injury-in-fact, for two reasons: it is too generalized, and it is too speculative.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

To satisfy the injury-in-fact requirement for Article III standing, a plaintiff must show that the injury is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  Friends of the Earth v. Laidlaw, 528 U.S. 167, 180 (2000) (quoting Lujan, 504 U.S. at 560–61.)

### 1.    "Concrete and Particularized"

Defendant argues that since all consumers of meat products share the same alleged harm of an increased risk of food poisoning, the injury is too generalized to qualify as an injury-in-fact. Plaintiffs respond that so long as an injury is concrete, rather than abstract, it qualifies as an injury-in-fact regardless of whether it is widely shared.

An injury is not "concrete" if the plaintiff's interest resides solely in ensuring that the government acts lawfully.  Lujan, 504 U.S. at 573–74 (holding that plaintiffs lacked standing because they asserted nothing more than an interest in the "proper application of the laws").  But so long as the plaintiff's interest is separate from a concern for faithful execution of the law, the injury may be concrete even though it is widely shared.  Federal Election Comm'n. v. Akins, 524 U.S. 11, 24–25 (1998).

In Akins, a group of citizens challenged the FEC's decision that an organization was not a "political action committee" and thus not subject to certain disclosure requirements.  Id. at 13–14. The citizens alleged that the FEC's decision prevented them from accessing information and thus limited their ability to make informed voting decisions.  Id.  Although all other voters suffered the same harm, plaintiffs alleged an injury-in-fact because the inability to access information is a concrete harm.  Id. at 24–25.

Plaintiffs' injury—the risk of contracting food-borne illness from meat products—is "concrete" since the harm is separate from an interest in having the government abide by the law. Once the court has determined that the injury is concrete, defendant's contention that the injury is widely shared does not negate standing.  See id.

8

**UNITED STATES DISTRICT COURT**
For the Northern District of California

Defendant's reliance on <u>Lyons</u> to argue that plaintiffs fail to allege a concrete injury is misplaced.  In <u>Lyons</u>, defendant did not contest that the alleged injury, unconsciousness resulting from a chokehold, was concrete.  <u>See</u> <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 102, 106–08 (1983) (denying standing on the grounds that Lyons failed to show a "real and immediate" threat of again being illegally choked, but not questioning that physical injuries from illegal chokeholds were "concrete" and "direct").  Rather, standing was denied on the grounds that plaintiff was unlikely to suffer harm in the future, which falls under the "actual or imminent" requirement.  <u>Id.</u> at 111–12.

Moreover, defendant's reading of <u>Lyons</u> is incompatible with the Court's later holding in <u>Akins</u>.  <u>Akins</u> found standing where a voter suffered the same alleged harm as all other voters. <u>Akins</u>, 524 U.S. at 24–25.  The Court rejected defendant's argument that a plaintiff lacks standing simply because the harm is widely shared and not differentiated:  "where a harm is concrete, though widely shared, the Court has found 'injury in fact.'"  <u>Id.</u> at 24.  A plaintiff may lack standing if the alleged harm is widely shared *and* "of an abstract and indefinite nature—for example, harm to the 'common concern for obedience to law.'"  <u>Id.</u> at 23.  Plaintiffs' alleged injury—exposure to an increased risk of food poisoning—is not an abstract concern that the government follow the law. Following <u>Akins</u>, this injury is "concrete" even though widely shared by other meat consumers.

### 2.    "Actual or Imminent"

Defendant advances three separate reasons why the consumers' injuries are not imminent: first, the chain of events leading from the USDA's actions to consumer illness is too attenuated; second, since plaintiffs have not demonstrated past harm, they cannot prove impending harm; third, the complaints fail to state an increased risk of harm to the plaintiffs, rather than to the general public.

### A.    Chain of Causation too Attenuated

A plaintiff must credibly allege that as a result of defendant's conduct, plaintiff is likely to suffer concrete harm in the future.  <u>See</u> <u>Ocean Advocates v. U.S. Army Corps of Eng'rs</u>, 361 F.3d

UNITED STATES DISTRICT COURT
For the Northern District of California

1108, 1119–20 (9th Cir. 2004), amended on other grounds, 402 F.3d 846 (2005); Central Delta Water Agency v. United States, 306 F.3d 938, 950 (9th Cir. 2002).  The Ninth Circuit has formulated the required degree of probability as a "credible threat of harm," "reasonable probability of harm" and "an increased risk of harm."  Central Delta Water Agency, 306 F.3d at 950; Churchill County v. Babbit, 150 F.3d 1072, 1078–79 (9th Cir.), amended on other grounds, 158 F.3d 491 (9th Cir. 1998); Ocean Advocates, 361 F.3d at 1120.  Although increased risk of harm may establish injury-in-fact, the Ninth Circuit has not decided upon the magnitude of the increase necessary to establish standing, nor has the Circuit addressed the issue of probabilistic harm to an aggregate population of consumers precisely analogous to the harm in this case.

The Second Circuit addressed the issue of probabilistic harm to a population of consumers in Baur v. Veneman, 352 F.3d 625 (2nd Cir. 2003).  In Baur, a consumer claimed that USDA regulations concerning "downed" livestock injured him by increasing the risk that eating beef would lead to neurological disease.  Id. at 628.  "Downed" livestock are "animals that collapse for unknown reasons and are too ill to walk or stand prior to slaughter."  Id.  Baur alleged that under the Federal Food, Drug, and Cosmetic Act, the FDA should label all downed livestock as "adulterated" and thereby prevent them from entering the food supply.  Id.  Then-current USDA regulations allowed downed cattle to be used for meat if the animal passed a mandatory post-mortem inspection. Id.

Baur had standing to sue since he alleged a credible threat of an increased risk of contracting disease from downed cattle.  Id. at 643.  For food and drug safety cases, exposure to increased risk of harm establishes standing if the threat is "credible."  Id. at 634, 637.  Exposure to risk, not the actual onset of disease, must be imminent.  Id. at 641.  Baur's allegations were credible enough to establish standing because he relied on government studies to support his allegations of injury and the risk of harm resulted directly from USDA policy.  Id. at 637–38.  The Second Circuit held that, at the pleading stage, Baur did not need to produce statistics on the magnitude of the increase in risk. Id. at 642.

10

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

The present case is analogous to Baur. First of all, this case like Baur is at the pleading stage. The present plaintiffs allege that USDA policy enables inhumanely slaughtered animals to enter the food supply. According to plaintiffs, inhumanely slaughtered animals are more likely to have bacterial contamination. Plaintiffs assert that USDA policy therefore increases the risk that consumers will become ill from food poisoning. In Baur, the court found the plaintiff's allegations credible because he relied on the government's own studies to establish the link between the USDA policy and the risk of injury. Id. at 637–38. Similarly, the instant plaintiffs allege that USDA studies indicate that inhumanely slaughtered animals are more likely to have bacterial contamination, bacterial contamination at the slaughtering stage correlates with contamination at the consumer stage, and food poisoning from bacterial contamination is prevalent. The Baur court found that the USDA's policy regarding downed cattle resulted directly in downed cattle entering the food supply and thereby increased the risk of disease transmission. Id. at 637–38. Likewise, the instant plaintiffs allege that as a result of the USDA exempting poultry processors from the humane slaughter requirements of the HMSA, processors allow inhumanely slaughtered animals to enter the food supply and increase the risk of bacterial contamination.

Ninth Circuit cases are substantially in accord with the result in Baur. In Central Delta, plaintiff farmers alleged that as a result of adopting an interim plan, the Bureau of Land Management's (BLM) operation of a dam would raise salinity levels in irrigation water. Central Delta Water Agency, 306 F.3d at 948. This, in turn, would damage the farmers' crops. Id. The court held that "a credible threat of harm is sufficient to constitute actual injury for standing purposes." Id. at 950. The threat of increased salinity levels was credible, since plaintiffs relied on the government's own statistical models to predict the effects of the Bureau's actions. Id. at 948. Plaintiffs thus stated an injury-in-fact and had standing. Id.

In Ocean Advocates, a permit issued by the Army Corps of Engineers would have allowed BP West to extend a dock at its oil refinery. Ocean Advocates, 361 F.3d at 1119–20. Expanding the dock would increase the risk of more oil tanker traffic, which would in turn increase the risk of an oil spill. Id. An oil spill would harm the plaintiff's aesthetic and recreational interests in the area.

11

Id. The plaintiffs alleged injury-in-fact because "increased risk of harm can itself be injury-in-fact for standing." Id. at 1120.

The above-mentioned Ninth Circuit cases stand for the rule that a plaintiff may have standing if she alleges an increased risk of concrete injury that results from a series of credible occurrences. Applying these principles to the present case, the court finds that plaintiffs allege facts sufficient to establish that each step in the causal chain is credible. In contrast, the courts in each case cited by defendant found individual steps in the causal chain to be implausible.

In Lyons, the plaintiff was stopped for a traffic violation by a Los Angeles police officer. Lyons, 461 U.S. at 97–98. Although the plaintiff offered no resistance, the officer placed him in a chokehold, causing injuries to plaintiff's neck and leaving him unconscious. Id. Lyons lacked standing to seek injunctive relief because he did not, and could not credibly, allege that he was likely to suffer a similar injury in the future. Id. The plaintiff failed to prove that he was likely to be stopped by the police again, and, even if he were stopped, that the police would use an illegal chokehold against him. Id. at 105–06.

In Whitmore v. Arkansas, a death row inmate claimed that under Arkansas's system of comparative review of death penalty cases, the omission of another inmate's information from the database of capital crimes injured him. Whitmore v. Arkansas, 495 U.S. 149, 151 (1990). Having been convicted of murder and sentenced to death, Whitmore had exhausted his direct appellate review and state postconviction relief. Id. at 156. For Whitmore to suffer injury from the exclusion of Simmons' information from the database, he would have to secure federal habeas corpus relief; be retried, convicted, and sentenced to death; secure comparative review by the Arkansas Supreme Court; and fail to have his conviction set aside by the Arkansas Supreme Court, based on the omission of Simmons' information in the death penalty database. Id. at 156–57. Whitmore lacked standing because each of these events was extremely unlikely to occur. He was unlikely to secure federal habeas relief. Id. at 159. He could not credibly allege that the judicial system would return any particular result, and thus could not allege that he was likely to be reconvicted and sentenced to death. Id. at 159–60. Lastly, even if he were granted a new trial and again sentenced to death,

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Whitmore alleged no facts to support the conclusion that including Simmons' information in the

2  database would cause the Arkansas Supreme Court to set aside Whitmore's sentence. Id. at 157,

3  160.

4       In Nelsen v. King County, plaintiffs were denied standing to bring a claim for injunctive

5  relief against King County for the operation of an alcohol treatment center. Nelsen v. King County,

6  895 F.2d 1248, 1254 (9th Cir. 1990). As an alternative to a jail sentence, plaintiffs had undergone

7  treatment in an alcohol center, which, they alleged, was operated in an unsanitary condition. Id. at

8  1249. To allege imminent harm from returning to the center, plaintiffs would have to assert that they

9  would resume drinking, commit an alcohol-related offense, be convicted, be offered the choice of

10  treatment, and return to find the Center in the same unsanitary conditions. Id. at 1252. The court

11  reasoned that these steps were highly uncertain: having testified that they were recovered

12  alcoholics, plaintiffs were unlikely to commit alcohol-related offenses again; even if they committed

13  such an offense, plaintiffs were not guaranteed an offer of treatment; even if offered treatment, there

14  was no guarantee they would return to the Center, which had a waiting list. Id.

15       In Lyons, Whitmore, and Nelsen, each court focused on the likelihood of individual steps

16  occurring, not the number of steps in the causal chain. See Lyons, 461 U.S. at 105–06 (finding that

17  plaintiff did not allege imminent injury since he was unlikely to be stopped by police and unlikely to

18  be subjected to an illegal chokehold); see Whitmore, 495 U.S. at 159–60, 166 (holding that plaintiff

19  lacked standing to sue because he could not show that a writ of habeas corpus was likely to be

20  granted, nor that, were it granted, he was likely to be convicted and sentenced to death); see also

21  Nelsen, 895 F.2d at 1252–54 (holding that plaintiffs lacked standing because each step necessary to

22  result in injury—committing an alcohol-related offense; being offered treatment in lieu of jail time;

23  returning to the same treatment center— was unlikely to occur).

24       In contrast, a court may find standing if each step in the causal chain is plausible, even if the

25  chain of events leading from defendant's conduct to plaintiff's injury is not immediate. See Ocean

26  Advocates, 361 F.3d at 1119–20 (finding standing where plaintiffs alleged that an Army Corps of

27  Engineers permit would allow BP west to extend a dock; the extension would increase the risk of

28

13

UNITED STATES DISTRICT COURT
For the Northern District of California

1   more oil tanker traffic; more traffic would increase the risk of an oil spill; and an oil spill would

2   harm plaintiffs' aesthetic and recreational interests in the land).

3          The credibility of plaintiffs' allegations in this case derives in large part from reliance upon

4   USDA studies.  First, the Notice reflects an ongoing policy to exempt poultry from the humane

5   slaughter requirements of the 1958 HMSA—indeed, the USDA acknowledges that this policy is

6   long-standing and likely to continue.  Def.'s Reply Brief at 22–23.  Second, various studies are cited

7   in support of the contention that inhumane methods of poultry slaughter increase the level of

8   bacterial contamination, and the September 28, 2005 USDA Notice acknowledges that inhumane

9   methods of handling and slaughtering poultry increase the likelihood of producing adulterated

10  product.  Levine Pls.' Complaint ¶¶ 85–90; Treatment of Live Poultry Before Slaughter, 70 Fed.

11  Reg. 56624.  Third, plaintiffs' allegation that the amount of bacterial contamination of poultry at the

12  processing stage is linked to the bacteria present at the consumer stage is based on a USDA

13  handbook.  Levine Pls.' Complaint ¶ 84.  Fourth, consumers regularly become ill from food

14  poisoning, as studies from the USDA indicate.  Id. ¶¶ 80–82.

15         The determination of whether a plaintiff alleges an imminent injury is admittedly not precise.

16  See Lujan, 504 U.S. at 564 n.2 (acknowledging that "'imminence' is concededly a somewhat elastic

17  concept"); see Nelsen, 895 F.2d at 1250 (holding that the Ninth Circuit measures the threat of future

18  harm "qualitatively, as requiring a very significant possibility, and not quantitatively").  The present

19  case arguably falls at the outer limits of injuries that a plaintiff may allege for Article III standing.

20  See Natural Resources Defense Council v. EPA, 440 F.3d 476, 484 (D.C. Cir. 2006) (finding that

21  plaintiff must show that the increase in risk of harm exceeds a certain threshold, or else the

22  requirement of imminent injury would be rendered meaningless).  The Baur court itself

23  acknowledged "the potential expansiveness of recognizing exposure to enhanced risk as injury-in-

24  fact," but reasoned that the doctrines of prudential standing, mootness, and ripeness would limit the

25  number of cases that could be brought.  Baur, 352 F.3d at 636.

26         With these concerns in mind, the court notes that these actions are at the pleading stage, and,

27  consequently, plaintiffs have not had the opportunity to conduct discovery and are not required to

28

14

make detailed factual allegations.  The court finds that plaintiffs credibly allege that they face an imminent exposure to heightened risk that they will become ill from consuming inhumanely slaughtered animals.  Plaintiffs plead facts sufficient to establish injury-in-fact for consumers' heightened risk of food-borne illness.  Defendant's motion to dismiss, on the grounds that plaintiffs' alleged injury is too speculative, is denied.

### B.   Past Injury

Defendant next argues that since plaintiffs have not alleged past injury from food poisoning, they cannot prove that future injury is imminent.  Defendant cites no case for the proposition that a plaintiff must allege past injury in order to show imminent injury.  If a plaintiff alleges past harm, a court will consider this as evidence in evaluating the likelihood of future injury.  See Laidlaw, 528 U.S. at 181 (holding that plaintiffs' testimony that they had refrained from using a river because of fear of pollution established that they would likely continue to suffer such harm from ongoing discharges by the defendant); see also Covington v. Jefferson County, 358 F.3d 626, 639 (9th Cir. 2004) (holding that plaintiff's evidence that a landfill had already contaminated the groundwater, caused fires and attracted animals established a concrete risk of future harm).  However, a plaintiff can demonstrate that future injury is likely without alleging past injury.  See Central Delta, 306 F.3d at 948, 950 (holding that plaintiffs had standing based on the likelihood that increased salinity would damage their crops, even though such damage had never occurred to these plaintiffs previously); see also Ocean Advocates, 361 F.3d at 1119–20 (finding standing for plaintiffs based upon the increased risk of an oil spill, even though the plaintiffs had never before been injured by an oil spill).  The motion to dismiss, on the basis that a plaintiff must allege past injury in order to allege imminent injury, is denied.

### C.   Widely Shared Harms

Defendant cites Lyons to argue that the complaints should be dismissed on the grounds that they allege a threat of harm to the general public rather than to the plaintiffs.  As noted in the section

UNITED STATES DISTRICT COURT
For the Northern District of California

15

discussing concrete harm, <u>supra</u>, in <u>Akins</u> the Supreme Court rejected the argument that an alleged injury cannot support standing even if it is widely shared.  <u>Akins</u>, 524 U.S. at 24–25 (holding that the alleged informational injury, which affected all voters in the same way, was sufficiently concrete to be an injury-in-fact).  The Court noted that in several instances, "where a harm is concrete, though widely shared, the Court has found "injury in fact."  <u>Id.</u> at 24.  Since in <u>Akins</u>, plaintiffs' alleged injury was identical to the injury suffered by all other U.S. voters, this court cannot find that a meat consumer lacks standing simply because the harm is shared by all other meat consumers.

The alleged increased risk to consumer health satisfies the Article III requirement of an injury-in-fact.

       b.     <u>Injuries to Workers</u>

           1.    <u>Physical Injuries</u>

Plaintiff workers John Does I and II allege that the USDA Notice allows inhumane slaughter practices, whereby poultry are killed while still conscious.  Conscious birds injure workers in several ways, according to plaintiffs.  Birds scratch and peck the workers while they attempt to shackle the birds.  Birds flap their wings, spreading dust and feces in the air, which workers then inhale.  Workers develop respiratory problems as a result.

Defendant concedes that the workers' alleged physical injuries are both concrete and actual.  The physical harms are not widely shared, but particular to poultry plant workers employed in plants that use inhumane methods of slaughter.  The workers allege that the physical injuries occur regularly, and are actual and ongoing, rather than conjectural.  The workers thus allege facts sufficient to establish injury-in-fact for their physical injuries.

           2.    <u>Emotional Injuries</u>

John Does I and II allege emotional injuries from directly witnessing the suffering of poultry in the slaughterhouses where they work.  Defendant contends that general emotional injury cannot establish injury-in-fact.

16

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Emotional injury from directly witnessing the suffering of animals can establish injury-in-

2    fact; emotional injury from a mere knowledge that animal suffering is occurring does not establish

3    injury-in-fact.  Compare Fund for Animals v. Lujan, 962 F.2d 1391, 1396–97 (9th Cir. 1992)

4    (holding that plaintiffs' emotional distress resulting from witnessing the killing of bison established

5    injury-in-fact) with Animal Lovers Volunteer Ass'n. v. Weinberger, 765 F.2d 937, 938–39 (9th Cir.

6    1985) (holding that plaintiffs' concern for the killing of goats, which they did not witness, was too

7    abstract to establish injury-in-fact).

8    John Does I and II allege that as a result of USDA policies, they suffer emotional injuries

9    from watching the slaughter of conscious birds.  They claim that they witness conscious animals

10    bleeding, experiencing pain, and suffering from broken wings and legs.  The workers allege that

11    their emotional injuries result from directly witnessing the suffering of poultry, rather than from an

12    abstract knowledge that suffering is taking place.  The workers state facts sufficient to establish

13    injury-in-fact for their emotional injuries, and their claims cannot be dismissed on that basis.

14    The court considers whether the Northern District of California is the appropriate forum for

15    the workers' claims, which are based entirely on events occurring in North Carolina, below.

16

17    c.    Representational Injury to Associations

18    Defendant contends that HSUS, EBAA and HFA lack standing to bring suit for the increased

19    health risks faced by their members.  Defendant argues that the associations' members lack standing

20    in their own right, and that the interests asserted in the lawsuits (consumer health) differ from the

21    central purpose of the organizations (animal welfare).  Defendant argues also that EJC and WNCWC

22    lack standing because their members—individual workers—do not themselves have standing.  The

23    association plaintiffs respond that their individual members do have independent standing and argue

24    that the alleged harms fall within the ambit of their organizational purposes.

25    For an association to have standing to sue on behalf of its members, it must show that: (1) its

26    members would have standing to sue "in their own right"; (2) the interests at stake in the lawsuit are

27    "germane to the organization's purpose"; (3) neither the claim nor the relief sought requires

28

17

1   members to participate individually in the litigation.  Laidlaw, 528 U.S. at 181.  Defendant concedes

2   that the third prong is satisfied by all association plaintiffs; defendant challenges the plaintiffs on the

3   first and second elements.

4

5           1.      Member Standing

6           To satisfy the first prong of the test for associational standing, each organization must

7   demonstrate that at least one of its members has independent standing to bring suit.  Id. at 181.

8

9                   A.      Associations' Representational Standing for Consumer Health Injuries

10          To the extent that the association plaintiffs EBAA, HSUS, and HFA claim standing based on

11  increased health risks, as discussed above, their individual members have standing.

12

13                  B.      Associations' Representational Standing for Worker Injuries

14          To the extent that the association plaintiffs EJC and WNCWC claim standing based on

15  physical and emotional injuries to workers, as discussed above, their individual members have

16  standing.

17

18                  C.      Association's Representational Standing for Animal Protection

19  Injuries

20          HFA contends that its members have a cognizable injury-in-fact in a desire that animals not

21  be illegally tortured.  Defendant argues that plaintiff's general emotional interest in the animals is

22  insufficiently particular to constitute injury-in-fact.

23          A plaintiff must assert an injury "beyond a generalized concern" about the challenged

24  conduct.  Compare Fund for Animals, 962 F.2d at 1396–97 (holding that plaintiffs' emotional

25  distress resulting from actually witnessing the killing of bison established injury-in-fact) with Sierra

26  Club v. Morton, 405 U.S. 727, 735, 739 (1972) (holding that a mere "interest in the problem" of

27  protecting natural resources did not establish standing for the Sierra Club absent some showing that

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  its members' aesthetic or recreational use of the land would be harmed by the proposed

2  development).

3          HFA cites <u>Colorado Wildlife Federation v. Turner</u> for the rule that individuals have standing

4  to protect species they will never see or eat.  Yet the court held that the plaintiffs had standing

5  precisely because they alleged that the challenged conduct harmed their "ability to observe the

6  razorback sucker and fish for the razorback sucker in areas where it flourished." <u>Colorado Wildlife</u>

7  <u>Federation v. Turner</u>, No. 92-F-884, 1992 U.S. Dist. LEXIS 22046, at *8–9 (D. Colo. Oct 27, 1992).

8  HFA members' interest in animal welfare is not sufficiently concrete and particularized to be

9  considered an injury-in-fact.  Thus, the portion of HFA's claim based on a "desire that animals not

10  be illegally tortured" is dismissed for a lack of standing.

11

12                    2.    <u>Organizational Purpose</u>

13                          A.    <u>Associations' Representational Standing for Consumer Health Injuries</u>

14          In the present case, three organizations have filed suit on behalf of their members for

15  consumer health injuries:  HFA, HSUS and EBAA.  The organizations assert an interest in the health

16  of their members, which, they contend, is threatened by the increased risk of food-borne illness from

17  inhumanely slaughtered meat products.   Defendant argues that the interest asserted by HSUS, HFA

18  and EBAA in the lawsuit—protecting the health of its members—is not germane to each

19  organization's core purpose of preventing animal cruelty.

20          EBAA states that it is "dedicated to fighting and preventing animal abuse in California's

21  agricultural industry."  In neither the complaint nor the reply brief does EBAA assert an

22  organizational interest in consumer health.  Levine Pls.' Complaint ¶¶ 18–19; Levine Pl.'s Reply

23  Brief at 11.  Based on the pleadings, this court finds that the only purpose of EBAA is preventing the

24  cruel treatment of farm animals.  An interest in consumer health is not germane to the purpose of

25  promoting animal welfare.  EBAA fails the second prong for associational standing, and thus its

26  claim to represent its members for injuries to consumer health is dismissed.

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   HSUS asserts that it is "dedicated to protecting domestic and wild animals" and that it

2   "invests considerable resources in advocating for farm animal welfare."  Levine Pls.' Complaint

3   ¶ 16.  It states that it reports on the impact of slaughter practices on human health.  Id. at ¶ 16.

4   Based on the factual representations made in the complaint, the mission of the HSUS is to "protect

5   domestic and wild animals," which is distinct from the consumer health interest HSUS asserts in this

6   action.   HSUS therefore fails to allege facts sufficient to establish associational standing, and its

7   claim is dismissed.  Both EBAA and HSUS are granted leave to amend the complaint to add a

8   germane organizational purpose, if one exists.

9   HFA alleges that it is "dedicated to the protection of farm animals, consumer protection and

10   human health."  Bison Pls.' Complaint at ¶ 10.  It alleges that its purpose is both to reduce cruelty to

11   animals and to reduce health risks to humans.  The interest HFA alleges in the litigation—the

12   increased risk of food poisoning suffered by its members—is germane to its purpose of protecting

13   human health.  HFA therefore satisfies the second prong necessary to establish associational

14   standing.

15

16   **B.      Associations' Representational Standing for Worker Injuries**

17   EJC states that its mission is employment justice and civil rights for low-wage workers.  The

18   interest it asserts in this suit—preventing physical and emotional injuries to workers in poultry

19   plants—is germane to its purpose of seeking just working conditions for low-wage workers.  EJC

20   satisfies the second prong for associational standing.

21   WNCWC states that its mission is to improve wages and working conditions for low-wage

22   and immigrant workers in Western North Carolina.  The organization's interest in the

23   litigation—reducing the risk of physical and emotional injuries to workers in poultry plants—is

24   germane to its purpose of improving working conditions for workers.  WNCWC meets the second

25   requirement for associational standing.

26

27   **d.      Direct Injury to Associations**

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   EJC and WNCWC also assert standing based on direct injuries to their organizational

2   interests.  Each group claims that the policies of the USDA injure it by causing it to divert resources

3   to the problems of poultry workers that it would otherwise use for other programs.  Defendant

4   replies that this injury is not cognizable since it is not an obstacle to carrying out the organization's

5   mission and not within the zone of interests protected by the 1958 HMSA.

6   An association can establish standing to sue for injuries to the organization itself, rather than

7   injuries to its members.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).  An association

8   must establish the same elements that an individual must prove in order to demonstrate Article III

9   standing: injury-in-fact, causation, and redressability.  Id.

10   In Havens, a housing organization demonstrated injury-in-fact by showing that defendant

11   apartment owner's racial discrimination frustrated its efforts to achieve equal opportunity housing.

12   Id.  As a result, the organization had to spend resources to counteract the discriminatory practices of

13   the defendant.  Id.  This concrete and particularized injury to the organization's activities was more

14   than an injury to the abstract social interests of the organization, and therefore constituted an injury-

15   in-fact.  Id.

16   Ninth Circuit cases have also found that an organization has standing if a defendant's alleged

17   illegal conduct increases the resources an organization must spend to address problems created by

18   defendant's conduct and diverts an organization's resources from other programs.  See Fair Housing

19   of Marin v. Combs, 285 F.3d 899, 903–04 (9th Cir. 2001), cert. denied, 537 U.S. 1018 (2002)

20   (holding that a fair housing organization had standing based on defendant's alleged housing

21   discrimination, which caused the organization to spend resources to investigate and counteract the

22   discriminatory conduct); El Rescate Legal Serv. Inc. v. Executive Office of Immigration Review,

23   959 F.2d 742, 748 (9th Cir. 1991) (holding that an organization had standing based on the agency's

24   frustration of the organization's mission, which caused the organization to spend resources that, in

25   the absence of the agency policy, it would not have spent).  Like an individual plaintiff, an

26   organization must allege a concrete, rather than abstract injury; the organization must allege that

27   defendant's conduct harmed the actual activities and programs of the organization, rather than

28

21

merely its abstract goals. See Project Sentinel v. Evergreen Ridge Apartments, 40 F. Supp. 2d 1136, 1139, 1141 (N.D. Cal. 1999) (Walker, J.) (holding that plaintiff lacked standing because the alleged harms were to the organization's abstract social goals and the costs of litigation, rather than an injury to its activities).

In the present case, both organizations conduct activities to improve the working conditions of poultry workers. Defendant's conduct, which allegedly results in greater rates of workplace accidents and illnesses, frustrates the efforts of these organizations to achieve just, safe working conditions. As a result, the organizations must expend resources on identifying and rectifying the problems allegedly caused by defendant. Defendant's allegedly illegal conduct increases the resources that these groups must devote to the problems of poultry workers, resources which would otherwise be spent on other programs. Following Havens, EJC and WNCWC allege facts sufficient to state an injury-in-fact.

e.      Injuries to Animal Species

Defendant moves to dismiss the claims brought by the plaintiffs American Bison (*Bison bison)* and Reindeer (*Rangifer tarandus*) on the grounds that animal species cannot have standing.

Article III does not prevent Congress from granting standing to animals, so a court must determine whether the relevant statute extends standing to animals. See Cetacean Cmty. v. Bush, 386 F.3d 1169, 1175–76, 1179 (9th Cir. 2004) (dismissing the action on the grounds that none of the statutes under which plaintiffs brought suit granted standing to animals).

In the present case, plaintiffs' claims cannot be dismissed on the grounds that animal species lack Article III standing, although, as discussed below, the animal species lack statutory standing under the APA.

II.     Prudential Standing

a.      Workers' Rights Organizations

22

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Defendant argues that EJC and WNCWC lack prudential standing because they fail the "zone

2  of interests" test.  See Bennett v. Spear, 520 U.S. 154, 162 (1997) (holding that prudential standing

3  requires that a plaintiff's alleged injury falls within the "zone of interests protected or regulated by

4  the statutory provision or constitutional guarantee invoked in the suit.").  According to defendant,

5  the interest asserted by the organizations—allocation of funds—is outside the zone of interests

6  protected by the HMSA.  Plaintiffs respond that safer working conditions in slaughterhouses is one

7  of the primary interests protected by the HMSA.

8    Defendant's attempt to characterize the organizations' injury as "economic" is impossible to

9  reconcile with Havens.  It is true that any injury to an organization's interests has economic

10  consequences, which can be quantified by the resulting changes to the organization's allocation of

11  resources.  But if a defendant could characterize plaintiffs' injury in this way, no organization would

12  ever have prudential standing, since virtually no statute has the goal of optimizing how an

13  organization spends its time and money.  Given the Supreme Court's holding that organizations can

14  have standing based on frustration of the organization's purpose, defendant's argument must fail.

15  See Havens Realty Corp., 455 U.S. at 379 (holding that a fair-housing organization had standing

16  because defendant apartment owner's racial discrimination frustrated its efforts to achieve equal

17  opportunity housing).

18

19    b.    Animal Species

20    Defendant contends that plaintiff animal species lack prudential standing to bring suit under

21  the Administrative Procedures Act (APA).  The Ninth Circuit has held that the APA grants a private

22  right of action to "any person affected or aggrieved by a relevant statute," and defines person to

23  exclude animals.  See Cetacean Community, 386 F.3d at 1176–77.  Plaintiffs Bison bison and

24  Rangifer tarandus thus lack prudential standing, and their claims are dismissed.

25

26  III.    Jurisdiction Under the APA

27

28

23

1    The 1958 HMSA does not provide for a private cause of action.  7 U.S.C. §§ 1901–1906.

2    Both the Levine and Bison plaintiffs rely solely upon the APA to establish jurisdiction for this court

3    to hear the present actions.  See 5 U.S.C. § 706.

4    Defendant argues that plaintiffs fail to challenge discrete, final agency actions, and thus

5    cannot bring suit under the APA.  The Levine plaintiffs contend that the Notice is a discrete and

6    final agency action reviewable under section 706(2) of the APA.  The Bison plaintiffs respond that

7    defendant's argument is based on section 706(2), but they bring suit under section 706(1), which has

8    a different legal standard.  Since each action is brought under a different section of the APA, each

9    claim will be addressed separately.

10

11        a.    Section 706(1)

12    Defendant contends that the Bison plaintiffs challenge a general deficiency in USDA

13    policy—failure to interpret the 1958 HMSA to include exotic animals—rather than any specific

14    USDA action or failure to act.  The Bison plaintiffs respond that they bring suit under section 706(1)

15    of the APA, which authorizes a court to "compel agency action unlawfully withheld or unreasonably

16    delayed."  5 U.S.C. § 706(1).  Plaintiffs contend that defendant's argument is aimed at suits brought

17    under section 706(2), and is inapplicable to an action brought under section 706(1).

18    To bring an action under section 706(1), a plaintiff must assert that "an agency failed to take

19    a *discrete* agency action that it is *required to take*."  Norton v. Southern Utah Wilderness Alliance,

20    542 U.S. 55, 64 (2004) (emphasis in original).  An agency action is discrete if it falls within one of

21    five categories:  rule, order, license, sanction, or relief.  Id. at 62.  An agency action is legally

22    required if it is a "ministerial or non-discretionary act."  Id. at 64 (quoting Attorney General's

23    Manual on the Administrative Procedures Act 108 (1947)).

24    In Norton, plaintiff alleged that the BLM had failed to ban all Off-Road Vehicle (ORV) use

25    from a Wilderness Study Area.  Id. at 65.  The Southern Utah Wilderness Alliance (SUWA) claimed

26    that this violated the BLM's legal mandate to manage Wilderness Study Areas so as not to impair

27    such areas for possible designation as wilderness.  Id.  Although the BLM was legally required to

28

24

UNITED STATES DISTRICT COURT
For the Northern District of California

1    pursue the goal of the statute—not impairing wilderness areas—it was not legally required to adopt

2    the means of banning all ORV use.  Id. at 66.  The BLM has wide discretion in how to achieve the

3    goals mandated by the statute.  Id.  The Court refused to enter a general order requiring the BLM to

4    comply with the statute, stating that to do so would constitute unwarranted judicial interference with

5    the agency's discretion.  Id.

6            Reading the complaint in the light most favorable to the plaintiffs, the Bison plaintiffs make

7    two claims under section 706(1).  First, plaintiffs claim that the USDA has failed to interpret "other

8    livestock" to include bison, reindeer, and elk.  This claim is indistinguishable from that advanced in

9    Norton.  Even if the court were to agree with plaintiffs that the phrase "other livestock" includes

10   Bison, Reindeer, and exotic animals, plaintiffs have not alleged any plausible basis for concluding

11   that the USDA has a ministerial duty to adopt the interpretation advocated by the plaintiffs.

12   Following Norton, this court has no jurisdiction under section 706(1) to review the USDA's failure

13   to interpret the HMSA in the manner urged by plaintiffs.

14           Second, the Bison plaintiffs allege that since the passage of the 1958 HMSA, the USDA has

15   never interpreted the phrase "other livestock."  According to plaintiffs, the USDA has therefore

16   unreasonably delayed complying with its legal duty to extend the 1958 HMSA to "other livestock."

17           Plaintiffs do not point to any passage in the 1958 HMSA which instructs the USDA to

18   interpret the phrase "other livestock."  Plaintiffs' claim must therefore rest on the theory that, by

19   including the phrase "other livestock," Congress implicitly directed the USDA to interpret that

20   phrase and issue regulations accordingly.  Plaintiffs cite no case in which a court found that a statute

21   created an implicit legal duty which would grant a court jurisdiction under section 706(1).  The

22   finding of unreasonable agency delay cited by plaintiffs involved an explicit statutory command.

23   See Natural Res. Def. Council v. Patterson, No. Civ. S-88-1658 LKK, 2004 U.S. Dist. LEXIS

24   22499, at * 37 (E.D. Cal. Aug. 26, 2004) (holding that the Bureau of Reclamation violated a

25   statutory command to "proceed in conformity" with state laws which mandated that water be

26   released so as to reestablish and maintain historic fisheries).  Other cases have hinged on a similar

27   finding of an explicit statutory duty.  See Beyond Pesticides v. Johnson, 407 F. Supp. 2d 38, 39–40

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    (D.D.C. 2005) (finding that the EPA had a legal duty to respond to plaintiff's petition, but holding

2    that EPA's delay in responding was reasonable); Forest Serv. Employees for Envtl. Ethics v. United

3    States Forest Serv., 397 F. Supp. 2d 1241, 1250–51 (D. Mont. 2005) (holding that the Forest Service

4    violated a non-discretionary duty under NEPA to prepare an environmental impact statement before

5    using chemical fire retardant).

6    Plaintiffs' contention that the USDA has an implicit legal duty to interpret "other livestock"

7    is not based on inferences drawn from legislative history or other parts of the 1958 HMSA.  Rather,

8    plaintiffs make an argument of general applicability:  whenever Congress does not define a phrase,

9    such as "other livestock," the relevant agency has a mandatory duty to interpret that phrase and issue

10   regulations accordingly.  The court cannot accept this rule, because it would expand the scope of

11   judicial review of agency action beyond any reasonable limits.

12   The Supreme Court has stated that the purpose of the APA is to avoid "pervasive oversight

13   by federal courts over the manner and pace of agency compliance with congressional directives."

14   Norton, 542 U.S. at 67.  In Norton, although the Bureau of Land Management had a legal duty to

15   manage wilderness study areas so as to preserve their wilderness character, the Court refused to

16   order the agency to comply with this mandate.  Id.  Since the statutory mandate was so broad, the

17   Court refused to decide in a general sense what constituted compliance.  Id.

18   Under Norton, this court must decide whether a statutory command to interpret "other

19   livestock" is so broad that issuing an order would require impermissible oversight of an

20   administrative agency.  The Norton court, in dicta, offered examples of overly broad statutory

21   mandates:  to "manage the New Orleans Jazz Historical Park in such a manner as will preserve and

22   perpetuate knowledge and understanding of the history of jazz" and to manage horses and burros so

23   as to maintain ecological balance.  Id.  Discrete actions such as responding to a petition or releasing

24   water are not too broad, while managing an area so as to preserve its wilderness character is too

25   broad to enable judicial review.  Compare Beyond Pesticides, 407 F.Supp. 2d at 39–40 and Natural

26   Resources Defense Council, 2004 U.S. Dist. LEXIS 22499  at * 37 with Norton, 542 U.S. at 64.

27

28

1    Here, as in <u>Norton</u>, interpreting the phrase "other livestock" is too nebulous a task to be susceptible

2    to judicial review.

3        Since the action plaintiff seeks is one the agency is not legally required to take, the court

4    need not reach whether the action is discrete.  The Bison complaint is therefore dismissed.

5        b.        Section 706(2)

6        The Levine plaintiffs bring this action under APA section 706(2).  Defendant argues that the

7    Notice is not a final agency action reviewable by this court for two reasons.  First, defendant argues

8    that agency expressions or explanations of a statute are not reviewable under the APA.  Second,

9    defendant contends that agency decisions exempting a class of activities from regulation are not

10   reviewable.

11       Under section 706(2)(A), a court may "hold unlawful and set aside agency action, findings

12   and conclusions" found to be "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A).  A court may

13   review an action under section 706(2) only if the action is discrete and final.  <u>City of San Diego v.</u>

14   <u>EPA</u>, 242 F.3d 1097, 1101–02 (9th Cir. 2001).  A discrete action covers "comprehensively every

15   manner in which an agency may exercise its power."  <u>Whitman v. American Trucking Ass'ns</u>, 531

16   U.S. 457, 478 (2001).  To be considered "final", an agency action must (1) "mark the consummation

17   of the agency's decision making process" and not be tentative, and (2) have legal consequences.

18   <u>Bennett,</u> 520 U.S. at 177–78.

19       The USDA's Food Safety and Inspection Service (FSIS) published the Notice in the Federal

20   Register on September 28, 2005.  Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. 56624

21   (Sept. 28, 2005).  FSIS stated that it was issuing the Notice because of recent public and

22   Congressional interest in the humane treatment of animals, especially poultry.  <u>Id.</u> at 56624.  The

23   Notice states that "there is no specific federal humane handling and slaughter statute for poultry."

24   <u>Id.</u> at 56625.  The notice also says that the 1978 HMSA does not include provisions for the humane

25   slaughter of poultry.  <u>Id.</u>

26       Defendant's principal contention is that the Notice merely reminds processors of their

27   obligations under current laws.  According to defendant, the Notice does not interpret the 1958

28

                                              27

UNITED STATES DISTRICT COURT
For the Northern District of California

HMSA phrase "other livestock," but rather explains the clear state of the law after the 1978 HMSA. Defendant cites no case law to support a distinction between agency "interpretation" of a statute and agency "explanation" of a statute. If accepted by this court, defendant's argument would immunize virtually all agency action from judicial review under the APA; any agency action could be characterized as merely "explaining" the clear intent of a statute and thus, according to defendant, avoid judicial review. There is no meaningful basis for drawing this distinction. Assuming, arguendo, that the USDA is correct and no current statute includes humane slaughter provisions for poultry, the USDA is still interpreting the HMSA and other statutes in order to arrive at this conclusion. A correct interpretation of statutory authority is nonetheless an interpretation.

Second, defendant argues that the Notice is not a final agency action because it does not require anything of processors nor specify any penalties for non-compliance with the Notice. These arguments are unavailing because they would insulate from judicial review any decision not to regulate. By definition, a decision not to regulate an activity means that no obligations will be imposed, and there can be no penalties for failing to comply—since there is nothing with which to comply. The case law does not support defendant's broad assertion; an agency decision to not regulate an activity may be a final agency action reviewable under the APA. See Pacific Coast Fed'n of Fishermen's Ass'ns., Inc. v. National Marine Fisheries Serv., 265 F.3d 1028, 1034–35 (9th Cir. 2001) (holding that biological opinions that proposed timber sales would not endanger species and thus were not prohibited by the ESA were final agency actions under the APA); see also Environmental Prot. Info. Ctr. v. Pacific. Lumber Co., 266 F. Supp. 2d 1101, 1122 (N.D. Cal. 2003) (Patel, J.) (hereinafter "EPIC") (holding that EPA's decision not to amend existing regulations was a final agency action because it continued to exempt a class of activities from regulation).

EPIC concerned an EPA decision to not amend a prior EPA regulation that exempted certain silvicultural activities from the requirements of the Clean Water Act. EPIC, 266 F. Supp. 2d at 1107–09. The EPA had proposed changing this regulation, but decided in a 1999 decision published in the Federal Register to retain the 1976 exemption for certain timber activities. Id. at 1109. The defendant argued that since the EPA did not change existing regulations, no legal consequences

28

flowed from the 1999 decision, and it was not reviewable.  Id. at 1122.  The court rejected that argument, and held that the decision not to alter the silvicultural exemption was a final agency action.  Id.

Defendant makes the same argument that the defendant in EPIC made:  that an agency decision to confirm a preexisting exemption of activities from regulation has no legal consequences.  This court rejected that argument in EPIC, and rejects it in the present case.  Having rejected defendant's argument that the Notice is categorically exempt from judicial review, the court considers whether it meets the requirements for justiciability under the APA.

1.      Consummation of the Decision-Making Process

In order for a court to have jurisdiction to review the USDA's Notice, the Notice must "mark the consummation of the agency's decisionmaking process" and not be tentative.  Bennett, 520 U.S. at 177–78.  Courts examine the statements and behavior of the agency to determine whether the decision is tentative; the agency's characterization of its decision is not controlling.  See EPIC, 266 F. Supp. 2d at 1121; see also Whitman, 531 U.S. at 479 (2001) (holding that an EPA decision was final because it had refused to reconsider the issue, even though the decision lacked the formal indicia of a final decision).

The September 28, 2005 Notice does not announce plans to revisit the issue or commence proceedings that would culminate in a decision on humane slaughter regulations for poultry.  See Industrial Customers of Nw. Util. v. Bonneville Power Admin., 408 F.3d 638, 647 (9th Cir. 2005) (holding that an agency decision was not final because it "serves only to initiate the proceedings" that would result in a final decision on electric rates); see also City of San Diego, 242 F.3d at 1101–02 (holding that an agency letter was not final because it did not even initiate the formal decision-making process regarding the city's permit application).  There is no pending administrative action by the USDA that would make judicial review premature.  See Western Shoshone Nat'l. Council v. United States, 408 F. Supp. 2d 1040, 1050 (D. Nev. 2005) (holding that a Department of Energy recommendation to store nuclear waste at Yucca Mountain was not a final

29

1    decision and courts should not "engage in review where pending administrative proceedings or

2    further agency action might render the case moot and judicial review completely unnecessary"

3    (quoting Sierra Club v. U.S. Nuclear Regulatory Comm'n, 825 F.2d 1356, 1362 (9th Cir. 1987))).

4         The Notice's statement of the legal obligations of poultry processors is phrased in categorical

5    terms:  the 1978 HMSA "does not include comparable provisions concerning the handling and

6    slaughter of poultry" and "as is explained above, there is no specific federal human handling and

7    slaughter statute for poultry."  Treatment of Live Poultry Before Slaughter, 70 Fed. Reg. at

8    56624–25.  The Notice is a "definitive statement" of the USDA's position on the legal obligations

9    concerning the humane slaughter of poultry.  See Industrial Customers of Nw. Util., 408 F.3d at 646

10   (holding that the Ninth Circuit looks to certain factors, including whether the action amounts to a

11   definitive statement of the agency's position, to determine the finality of an agency decision).  The

12   court finds that the USDA Notice satisfies the first requirement that an agency action mark the

13   consummation of the agency's decisionmaking process and not be tentative.

14

15                    2.    Legal Consequences

16        The USDA Notice must also have legal consequences in order to be a final agency action

17   reviewable under the APA.  See Bennett, 520 U.S. at 177–78.

18        An action may have no legal consequences if it is a general policy statement of principles,

19   rather than a statement about legal obligations.  See Borg-Warner Protective Serv. Corp. v. EEOC,

20   81 F. Supp. 2d 20, 28 (D.D.C. 2000).  In Borg-Warner, the EEOC issued a policy statement to the

21   effect that requiring, as a condition of employment, mandatory arbitration of discrimination claims is

22   contrary to the fundamental principles of civil rights laws.  Id. at 22.  The policy statement argued

23   that mandatory arbitration agreements of discrimination claims undermine the enforcement scheme

24   and the goals of federal anti-discrimination laws; the policy statement did not state that mandatory

25   arbitration agreements of discrimination claims, imposed as a condition of employment, are illegal.

26   See Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as

27   a Condition of Employment, EEOC Notice No. 915.002 (July 10, 1997).  The court held that there

28

30

1    were no legal consequences from the policy statement since it was not a statement about the legal

2    obligations of employers and had no legal effect on employers.  Borg-Warner Protective Serv. Corp.,

3    81 F. Supp. 2d at 27–28.

4          By contrast, a final decision not to regulate may have legal consequences if it has the "direct"

5    and "immediate" consequence of continuing to exempt activities from regulation.  See EPIC, 266 F.

6    Supp. 2d at 1122.  In EPIC, the EPA decided not to amend its preexisting exemption of certain

7    timber practices from regulation under the Clean Water Act.  Id.  The court held that this decision

8    had legal consequences because these activities were thereby not regulated under the Clean Water

9    Act.  Id.

10         The September 28, 2005 USDA Notice states definitively that poultry processors have no

11   legal obligations to slaughter poultry humanely:  "as is explained above, there is no specific federal

12   human handling and slaughter statute for poultry."  Treatment of Live Poultry Before Slaughter, 70

13   Fed. Reg. 56625 (Sept. 28, 2005).  The USDA Notice is not a policy statement of principles, as in

14   Borg-Warner, but rather is a definitive statement that poultry processors will not be regulated, as in

15   EPIC.

16         Defendant relies on National Park Hospitality Association v. Department of the Interior, 538

17   U.S. 803 (2003) for the proposition that general agency interpretations of the law, untethered to

18   specific factual scenarios, are not final agency actions.  Contrary to defendant's assertion, the court

19   held explicitly that the Park Service's interpretation of the Contract Disputes Act "constitutes final

20   agency action" within the meaning of the APA.  Id. at 812.  The action was dismissed on the

21   grounds that the controversy was not ripe for judicial review.  Id.

22         Defendant confuses the merits of its argument with the jurisdictional requirements of the

23   APA.  Defendant may, or may not, interpret its statutory authority correctly.  But the merits of that

24   interpretation are distinct from whether the interpretation is a final agency action reviewable under

25   section 706(2).  The court finds that the Notice's statement that poultry processors have no legal

26   obligations to slaughter poultry humanely has legal consequences.  Since the Notice is not tentative

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   and has legal consequences, this court has jurisdiction to review the Notice under section 706(2) of

2   the APA.  Defendant's motion to dismiss is denied.

4   IV.   Redressability

5       Defendant also argues that plaintiffs have failed to allege that the relief sought in this lawsuit

6   will lead to any reduction in the inhumane slaughter of poultry and exotic animals.  According to

7   defendant, the lack of any statutory enforcement mechanism renders defendant powerless to correct

8   any violations of the 1958 HMSA.

9       A plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a

10  favorable decision *will inevitably* redress his injury."  Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir.

11  1994) (emphasis in the original) (citing Lujan, 504 U.S. at 561); see also Graham v. Federal

12  Emergency Mgmt. Agency, 149 F.3d 997, 1003 (9th Cir. 1998) (holding that plaintiffs need not

13  show that there is a "guarantee" that their injuries will be redressed by a favorable decision, only

14  that it is "likely").  When a plaintiff's injury results from government regulation of, or failure to

15  regulate, a third party not before the court, the plaintiff has a higher burden for establishing

16  redressability.  Lujan, 504 U.S. at 562.  The plaintiff has the burden of showing that if the court

17  grants the requested relief, the third party will exercise its discretion in such a way as to redress the

18  plaintiff's injury.  Id.

19      The Levine plaintiffs offer several ways in which federal and state agencies could enforce a

20  favorable interpretation of the 1958 HMSA if such an interpretation is ordered by the court.

21  Plaintiffs contend that if this court declared that, as a matter of law, "other livestock" includes

22  poultry, then the USDA would likely interpret the FMIA to include poultry.  The USDA could then

23  enforce the 1958 HMSA through the FMIA.

24      The FMIA grants the USDA authority to refuse inspection to processors which do not

25  comply with the humane slaughter requirements of the 1958 HMSA.  21 U.S.C.S. § 603(b).  In 1978,

26  Congress amended the FMIA to require that all "cattle, sheep, swine, goats, horses, mules, and other

27  equines" be slaughtered in accordance with the humane slaughter standards of the 1958 HMSA.

28

Pub. L. 95-445 § 2.  In 2005, Congress replaced all references in the FMIA to "cattle, sheep, swine, goats, horses, mules, and other equines" with "amenable species."  Pub. L. 109-96 § 798. "Amenable species" is defined as the species listed under the FMIA prior to the 2005 Amendment as well as "any additional species of livestock that the Secretary considers appropriate."  § 798(2).

The Levine plaintiffs seek a declaration from the court that the Notice's exclusion of poultry from the 1958 HMSA is arbitrary and capricious.  While it may be questionable whether "other livestock" includes poultry, given that term's definition or usage under other statutes in the same title, this is not the stage at which that issue should be determined.  Were the court to grant the relief sought by these plaintiffs, the court would be declaring that the 1958 HMSA applies humane slaughter requirements to the processing of poultry.  It is reasonable to assume that the Secretary of Agriculture would then enforce this interpretation through the FMIA, which gives the Secretary the authority to apply humane slaughter requirements to appropriate species.  Thus, the Levine plaintiffs establish redressability by alleging that the relief requested would likely lead the USDA to enforce humane slaughter requirements for poultry through the FMIA.

Since the Levine plaintiffs allege redressability under the FMIA, the court does not reach plaintiffs' alternative bases for redressability.

V.    Venue

Finally, the court considers whether the claims of the worker plaintiffs and the organizations representing them are properly brought in this district.  Based on the allegations in the complaint, all of the events conferring standing on the two individual worker plaintiffs took place in North Carolina, outside this district.  One of the two worker organizations, the Western North Carolina Workers' Center, is also apparently focused on employee rights in North Carolina.  The claims of the other worker organization, Equal Justice Center, are identical to those raised by the two individual workers and WNCWC.

A court may *sua sponte* order dismissal of an action for improper venue, provided that the parties have had an opportunity to be heard.  Costlow v. Weeks, 790 F.2d 1486, 1488 (9th Cir.

UNITED STATES DISTRICT COURT
For the Northern District of California

33

1986). The parties have not yet presented the court with any arguments for or against venue in this district for the worker and worker organization claims. The court therefore orders plaintiffs to show cause, within 30 days of this order, why these claims should not be dismissed without prejudice for improper venue, allowing them to be refiled in the appropriate district in North Carolina. Defendant is ordered to respond within 14 days of the filing of plaintiff's submission.

CONCLUSION

     For the above reasons the court hereby GRANTS defendant's motion to dismiss the Bison plaintiffs' complaint with prejudice. The court GRANTS defendant's motion to dismiss the claim of the Humane Society of the United States with leave to amend. The court GRANTS defendant's motion to dismiss the complaint of East Bay Animal Advocates with leave to amend.

     The court DENIES defendant's motion to dismiss the claims of individual consumers (Dr. Ellen Levine, Beverly Ulbrich, Krista Kielman, Gretchen Wallerich and Kandra Boykin).

     The court orders plaintiffs to show cause why the claims of the workers (John Doe I and II), the Equal Justice Center and the Western North Carolina Workers' Center should not be dismissed without prejudice for improper venue, as set forth in more detail above.

IT IS SO ORDERED.

Date:   September 5, 2006                      _____

                                           MARILYN HALL PATEL
                                           United States District Judge
                                           Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1

UNITED STATES DISTRICT COURT
For the Northern District of California

ENDNOTES

1.  Unless otherwise noted, background facts are taken from plaintiffs' Complaints.

35